722 A.2d 997

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Emanuel LESTER, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 30, 1997.

Decided Dec. 22, 1998.

Reargument Denied April 19, 1999.

646

Daniel Silverman, Philadelphia, for E. Lester, appellant.

Catherine Marshall, Philadelphia, Robert A. Graci, Office of the Atty. Gen., Marilyn F. Murray, Philadelphia, for the Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

### OPINION OF THE COURT

CASTILLE, Justice.

This is appellant's direct appeal from the judgment of sentence of death imposed by the Court of Common Pleas of Philadelphia County.[1] Following a jury trial, appellant was convicted of first degree murder,[2] possession of an instrument of crime[3] and aggravated assault.[4] Following a penalty phase hearing, the jury found two aggravating circumstances and no mitigating circumstances and returned a sentence of death.[5]

---

**1.** 42 Pa.C.S. § 9711(h)(1).

**2.** 18 Pa.C.S. § 2502(a).

**3.** 18 Pa.C.S. § 907.

**4.** 18 Pa.C.S. § 2702.

**5.** The aggravating circumstances were that the offense was committed by means of torture, 42 Pa.C.S. § 9711(d)(8), and appellant knowingly

## I. SUFFICIENCY OF EVIDENCE

 Appellant has challenged the sufficiency of the evidence only as it relates to his conviction for possession of an instrument of crime; however, in all cases where the death penalty is imposed, this Court must conduct a review of the sufficiency of the evidence to support a conviction for first degree murder. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26, 454 A.2d 937, 942 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327, *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). In reviewing the sufficiency of the evidence, an appellate court must view all the evidence and all reasonable inferences therefrom in the light most favorable to the Commonwealth as the verdict winner, and determine whether the evidence was sufficient to enable the fact finder to find that all of the elements of the offenses were established beyond a reasonable doubt. *Commonwealth v. Burgos,* 530 Pa. 473, 476, 610 A.2d 11, 13 (1992). For the purposes of this Court's review, the record below establishes the following evidence:

In early 1990, the victim, Sheila Manigault, allowed appellant, an old friend, to stay in her apartment with her three children and herself. In April of 1990, after differences developed between appellant and the victim, appellant moved to another apartment in the same building and resided with Aaron Casper and Joan Walker. On April 5, 1990, Walker refused to allow appellant to enter the apartment because she was alone and did not want him there until Casper returned. Appellant returned to Casper's and Walker's apartment later that evening but did not stay. That same evening, Casper met the victim in the hallway of the building and accompanied her to her apartment. When Casper left the victim's apartment, he closed the door, which automatically locked behind him, leaving the victim and her sleeping children alone.

At 10:30 a.m. the next day, the victim's four-year-old daughter and her younger brother knocked on the door of a neighbor, Madeline Dickerson, and asked her to come with them.

created a grave risk of death to another person in addition to the victim, 42 Pa.C.S. § 9711(d)(7).

When Dickerson asked the little girl what was wrong, she answered: "Manny did it." As the children led Dickerson to their apartment, they also stated that, "She's in the bathroom."

When Dickerson entered the victim's apartment, she immediately observed blood on the walls and floor of the foyer, dining and kitchen areas. The children pulled her toward the bathroom where she found the victim in the bathtub with bloody water. Dickerson grabbed the two children and fled from the apartment. Dickerson then returned to the apartment to get the victim's infant daughter. Upon returning to her apartment, she summoned the police.

Police officers responding to the call found blood on the door, on the floor, and on the walls in the foyer, dining and living room areas. In the bathroom, they found the victim lying in the bathtub partially submerged in blood-soaked water. A homicide detective called to the scene noticed that the victim's older daughter had a swollen and bruised eye as well as bruise marks from what appeared to be finger or thumb prints on both sides of her neck. When he questioned the child regarding what had occurred, she stated: "Manny beat my mommy. Manny put my mommy in the bathtub and my mommy is dead." In response to questions about what happened to her eye, the little girl stated: "Manny punched me in the face and grabbed me around the neck and Manny kicked me in the side."

The detective and other police officers searched the victim's apartment and collected evidence including photographs, blood samples, pieces of a clothes iron and portions of hair braids similar to those on the victim's head. The detective observed that the victim had suffered scald burns to her face, right shoulder, chest, back and arm, extremely deep lacerations of her head revealing parts of her skull, and discoloration with small lacerations and punctures in the area of her left eye. The lacerations on her head were triangular in shape resembling the triangular shape of the front of a clothes iron.

On April 19, 1990, Walker, who knew appellant was wanted for the victim's murder, telephoned the police to inform them that she had seen appellant. Police drove Walker to the area where she had last seen appellant and arrested him after she identified appellant. Upon initial questioning, appellant identified himself as Emanuel Ali but later stated that his name was Emanuel Lester.

At trial, the victim's oldest daughter testified that on the night of the murder, she was sleeping in the bedroom with her mother and younger brother when she heard a noise. She awoke to see appellant hitting her mother in the head with a radio and a clothes iron. When the little girl tried to stop appellant, he punched and choked her and placed a pillow over her face. Appellant then pulled the victim out of bed, pulled part of her hair out, hit her in the head and the face with the iron, and put her in the bathtub.

The medical examiner testified at trial that the victim died from being beaten, scalded and finally drowned. She suffered second and third degree scalding burns of the neck, head, right shoulder, arm and back. The medical examiner stated that the splashing, patchy nature of the burn wounds suggested intermittent contact with hot liquid. She also suffered multiple contusions and abrasions as well as multiple lacerations of the scalp consistent with being struck with an iron. He further testified that the victim suffered all of these injuries while she was alive and that she was alive when she was placed in the bathtub.

Evidence is sufficient to sustain a conviction for first degree murder if the Commonwealth establishes that appellant acted with a specific intent to kill, that a human being was unlawfully killed, and that the killing was done with deliberation. 18 Pa.C.S. § 2502(d); *Commonwealth v. Mitchell*, 528 Pa. 546, 550, 599 A.2d 624, 626 (1991). The evidence in this case amply demonstrates that appellant committed the murder with the requisite intent and deliberation to sustain his first degree murder conviction.

■ Appellant complains that the evidence was insufficient to sustain his conviction for possession of an instrument of crime because the murder weapon was a clothes iron which does not meet the statutory definition of an instrument of crime under 18 Pa.C.S. § 907(d).[6] Appellant here "specially adapted" the clothes iron for criminal use by breaking the plastic handle from the metal plate. He used the plate on the victim's head creating triangular lacerations matching the front of the metal piece. The victim also suffered small puncture wounds around her left eye corresponding to a piece of the broken plastic handle found at the crime scene. Hence, the evidence was sufficient to convict appellant of possession of an instrument of crime.

## II. ALLEGATIONS OF TRIAL COURT ERROR

■ Appellant makes eight separate allegations of trial court error. First, he claims that the trial court erred in failing to give a cautionary instruction to the jury regarding the graphic nature of the crime scene photographs introduced at trial and shown to the jury. The black and white photographs of the crime scene and of the victim were admitted for the purpose of demonstrating to the jury the progression of appellant's attack on the victim and his pursuit of her through her apartment. These photos were clearly relevant and admissible to prove that appellant acted with specific intent to kill and with deliberation. The trial court cautioned the jurors during his charge to the jury that they were not to allow any type of emotional response to the photographs to affect their deliberations, but that they were to decide the case based upon the facts without regard to any emotions or sympathy connected to the photographs.[7] This claim is meritless.

6. "Instrument of Crime" as defined at the time of the homicide is: "(1) Anything specially made or specially adapted for criminal use; or (2) Anything commonly used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa.C.S. § 907(d)( section 907(d) was subsequently amended in 1995 with the deletion of the word "commonly" from subsection (2)).

7. N.T. 11/12/91 at 60. Appellant does not claim that this instruction was deficient.

■ Appellant's second claim of error is that the trial court erred in admitting hearsay testimony of two witnesses regarding statements made to them by the victim's four year old daughter. Both the investigating homicide detective and a physician at Children's Hospital of Philadelphia, where the daughter was taken for treatment after the discovery of the murder, testified at trial that she told them that appellant murdered her mother.

■ The admissibility of evidence is a matter which lies within the discretion of the trial court, and, absent an abuse of discretion, the trial court's decision will not be disturbed. *Commonwealth v. Bronshtein*, 547 Pa. 460, 480, 691 A.2d 907, 916 (1997). Here, the trial court determined that the testimony of the two witnesses, while hearsay, was admissible under the excited utterance exception. In *Commonwealth v. Penn*, 497 Pa. 232, 242, 439 A.2d 1154, 1159 (1982), this Court held that a statement made to police and in response to police questioning by a child who witnessed his mother's murder fell within the excited utterance exception even though the statement was not made immediately after the murder. Thus, the trial court did not abuse its discretion in admitting this evidence.[8]

■ Appellant's third claim of error is that he was deprived of a fair trial because trial counsel did not have sufficient time to prepare a closing statement. On Friday, November 8, 1991, the trial court granted appellant's request that he be allowed to personally give his own closing argument to the jury and so advised the jury. The court then recessed for a three-day weekend to give appellant time to prepare his closing. On Tuesday, November 12, 1991, the trial court reversed its decision due to its concerns that, because appellant had not been present in the courtroom for much of the trial,[9] the jurors would be prejudiced against him. The court

---

8. The admission of the evidence, even if erroneous, was also harmless error as the daughter testified on direct that appellant had killed her mother.

9. Appellant was removed from the courtroom due to outbursts and inappropriate behavior in the presence of the jury. He observed parts of the trial via closed-circuit television in an anteroom.

then allowed appellant time to confer with his counsel to discuss the points he wanted raised in the defense summation.

The record reveals that this claim is baseless. At the trial court's hearing on post-verdict motions, appellant's trial counsel repeatedly stated that, while he was surprised by the court's decision, the court *had* allowed him enough time to prepare to close.[10] Because it was counsel's position that he had sufficient time to prepare to close, there is no merit to appellant's contention that he was prejudiced by the trial court's decision.

As his fourth claim of error, appellant argues that the trial court erred in instructing the jury as to flight because there was no evidence that an arrest warrant was in effect during the time appellant concealed himself or that he knew, or should have known, that police were searching for him. This Court previously has held that the Commonwealth need not establish direct evidence of a defendant's knowledge that he is sought by the police for the commission of a crime in order for a flight charge to be warranted. In *Commonwealth v. Rios*, 546 Pa. 271, 291, 684 A.2d 1025, 1035 (1996), this Court stated that "[i]t is permissible to infer that a defendant knows he is wanted for a crime from the circumstances attendant to his flight." Here, the evidence demonstrated: that on the night of the murder, appellant did not return to the apartment building where the murder occurred and where he had been staying before the murder; that his grandmother, ex-wife, son and sister all knew the police were searching for him; that he avoided the places he normally frequented; that when apprehended, he possessed identification in three different names; and that he initially gave a false name to police. From this evidence, one can reasonably infer that appellant was avoiding apprehension by the police; therefore, a flight charge was appropriate.

10. N.T. 2/21/95 at 45–53. Counsel also stated that if the court had not provided enough preparation time, he would have requested a continuance.

■ For his fifth allegation of error, appellant claims that the trial court erred in refusing to instruct the jury as to second degree murder because the evidence supported an inference that the killing occurred during the commission of a burglary. However, appellant was not charged with burglary and he fails to point to any evidence in his case to support his position that a burglary occurred.[11] The mere fact that a crime occurred inside a building, without more, is not sufficient to demonstrate burglary. It is axiomatic that a trial court should only charge a jury on an offense when the offense has been made an issue in the trial, and the evidence reasonably would support such a verdict. *Commonwealth v. Browdie*, 543 Pa. 337, 349, 671 A.2d 668, 674 (1996). Because there was no evidence of burglary, the court properly refused to charge the jury on second degree murder.

■ Appellant's sixth claim is that the trial court erred in refusing to instruct the jury on voluntary manslaughter because he claims that the evidence demonstrated that the killing occurred in the heat of passion after the victim asked appellant to move out of her apartment. The evidence in this case could not support a verdict for voluntary manslaughter on that basis because the victim asked appellant to leave her apartment several days before the murder. The passage of time before the murder occurred would negate any suggestion that appellant acted in a rage as a result of the victim's request. Thus, with no evidence to support a verdict of voluntary manslaughter, the trial court correctly refused the requested instruction. *See id.*

■ Appellant contends as his seventh claim of error that the trial court erred in refusing to allow his trial counsel to

---

**11.** 18 Pa.C.S. § 3502 defines a burglary as an unauthorized entry into a building, occupied structure or separately secured or occupied portion thereof with the intent to commit a crime therein. Appellant claims that the fact that the victim had requested that he move from her apartment because of differences between them shows that any entry that night must necessarily have been forced. The evidence, however, showed that when Aaron Casper left the victim's apartment on the night of the murder, the door locked automatically behind him. There was no sign of forced entry, and the evidence showed that the victim and appellant were old friends.

withdraw and in denying his request to obtain new counsel because an "actual conflict of interest" existed. Appellant filed suit against his trial counsel on the first day of trial as he had previously done with his prior court-appointed counsel who was then permitted to withdraw.[12] Appellant refused to change into civilian clothes and to proceed with his trial counsel. Counsel indicated that he was ready for trial, and the court denied appellant's request. When a jury panel was brought into the courtroom, appellant stood and informed the jury that he had filed a civil suit against his counsel and refused to be seated. After the jury panel was removed from the courtroom, appellant punched trial counsel, and the court ordered appellant handcuffed. The court ultimately dismissed the first jury panel due to appellant's continued obstreperous behavior.

On the following day, trial counsel requested leave to withdraw, and the trial court refused the request and appellant's request for change of court-appointed counsel because a similar situation had occurred with prior counsel and the court feared the scenario would be repeated *ad infinitum*. It is within the trial court's discretion to determine whether a petition for change of court-appointed counsel should be granted. *Commonwealth v. Saranchak*, 544 Pa. 158, 172 n. 14, 675 A.2d 268, 275 n. 14 (1996). Here the trial court did not abuse that discretion given appellant's past behavior, likely recurrent in nature, to avoid trial of this matter.

Appellant's eighth and final claim of trial phase error involves the Commonwealth's closing argument. Appellant contends that he was prejudiced by the prosecutor's references to him as a "murderer," "child beater" and "torturer,"

12. Appellant's trial was first scheduled to begin on July 29, 1991. On that date, appellant requested the appointment of new counsel because he had filed a civil suit against his court-appointed counsel. When the court indicated that the trial would proceed, appellant became disruptive and refused to wear civilian clothing. The court continued the trial for two days to allow appellant and his counsel time to confer. On July 31, 1991, the court agreed to the appointment of new counsel because it was clear that appellant intended to disrupt the trial and the court feared that he would physically harm his counsel. Instant trial counsel was then appointed.

and by the court's failure to sustain his objection to the comments. After discussing appellant's name change and aliases, the prosecutor concluded his closing by stating:

And you are going to give him a name he can't change— Emanuel Ali, Joseph Williams, Emanuel Lester, whatever your name is—because you are going to give him the name he deserves. You are going to say, Mr. Lester, you are a murderer. And you are going to point your finger with a verdict, point the finger of guilt at him that Nateefah couldn't because of his absence. You will say to him, Mr. Lester, as I say now, Mr. Lester, you are a child beater ... You are a torturer and you are a murderer, and do it fairly. Thank you.

"Comments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Bronshtein*, 547 Pa. 460, 482, 691 A.2d 907, 917 (1997). The instant comments were not of such a nature to prejudice the jury and were fair comments based upon the evidence. Hence, no relief is warranted.

## III. *ALLEGATIONS OF PENALTY PHASE ERROR*

Appellant raises five separate claims of error in the penalty phase of his trial. First, he contends that the trial court erred in instructing the jury regarding the aggravating circumstance of torture. Specifically, he argues he is entitled to a new penalty hearing because the trial court failed to follow the specific language set forth in *Commonwealth v. Nelson*, 514 Pa. 262, 280, 523 A.2d 728, 737 (1987), that in order for the jury to find the aggravating circumstance of torture, it must find that the torture was separate and apart from the commission of the murder and that appellant must have had the specific intent to torture his victim.[13]

13. At the outset, we note that at no time per the record did defense counsel object to the instruction provided prior to the matter being submitted to the jury. Pa. R.Crim. P. 1119 ("No portions of the charge

In *Commonwealth v. Nelson,* the issue before the Court was whether the trial court's failure to offer the jury any guidance regarding the definition of torture resulted in a deficient jury instruction which would require a new penalty hearing. The instruction by the trial court in *Nelson* was simply:

Now, the Crimes Code [sic] defines aggravating circumstances. For purposes of this particular case only the following matters, if proven, can constitute aggravating circumstances, and in this case there is only one item in which the Commonwealth is contending under the Crimes Code [sic], that there is an aggravating circumstance, and that is that the offense was committed by torture.

523 A.2d at 736.

In *Commonwealth v. Pursell,* 508 Pa. 212, 495 A.2d 183 (1985), decided two years before *Nelson,* this Court found no reversible error where the trial court defined torture for the jury as:

One of the [definitions] of torture is the Model Penal Code in which they say that the offense or murder committed by the means of torture is designed for the defendant who causes a considerable amount of pain and that the language used for this particularly aggravating circumstance is the murder was especially heinous, atrocious, or cruel manifesting exceptional depravity. Also, ... [the American Law Reports] stated that since murder is an intentional act, that many courts have determined, regarding murder by torture, a specific intent that the torture murderer has in committing the homicide. It has been held that this is an intention to inflict pain, suffering or both pain and suffering.

*Id.,* 495 A.2d at 197 n. 13. This Court found this instruction adequate to provide sufficient guidance to the jury on the

or omission therefrom may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate"). Therefore, this issue would normally be considered waived. We address the merits, however, because, while appellant did not raise this issue in the form of an ineffectiveness of counsel claim, he did include in his argument a brief mention of counsel's ineffectiveness for failing to object or submit an alternate instruction.

meaning of the term torture and found that this instruction did not warrant a new penalty hearing.

In *Nelson,* unlike *Pursell,* no defining instruction on the term torture had been given. Thus, this Court found that the jury had not been given any guidance which would aid it in finding that torture was a separate circumstance of a murder, and that a new penalty phase was required. 523 A.2d at 736–37.

■■■■ Here, unlike *Nelson,* the trial court did provide guidance to the jury regarding the definition of torture. The specific instruction was as follows:

> You may also consider that the offense was committed by means of torture. This is defined as the infliction of considerable amount of pain and suffering on the victim which is unnecessary, hence atrocious or cruel, manifesting exceptional depravity.

N.T. 11/13/91 at 107. While the instruction set forth in *Commonwealth v. Pursell* is the preferred instruction, we find that this instruction does not require a new penalty hearing given the exceptional depravity of the killing and that an adequate definition of torture was provided similar to that which we approved in *Commonwealth v. Pursell, supra.*[14] Further, unlike the jury in *Nelson,* this jury was not asked to find the aggravating circumstance of torture based upon sparse or speculative evidence of torture. Rather, in this case, the evidence of torture was abundant.[15]

**14.** We note that the instruction followed on the heels of the prosecutor's closing argument wherein it was constantly emphasized that pain and suffering must have been intentionally inflicted. See, e.g., N.T. 11/13/91 at 94.

**15.** Even if the trial court erred in failing to instruct the jury that it must find specific intent to torture, the error was harmless as the jury found two aggravating circumstances and no mitigating circumstances. Therefore, if we were to hold that the jury's finding of the aggravating circumstance of torture was the result of error by the trial court, the remaining aggravating circumstance with no mitigating circumstances would still mandate the sentence of death pursuant to 42 Pa.C.S. § 9711(c)(1)(iv). *See, e.g., Commonwealth v. Beasley,* 504 Pa. 485, 500, 475 A.2d 730, 738 (1984) (death penalty required where jury found at

■ Appellant next claims that the trial court erred in its charge to the jury by failing to define "grave risk of death" as it relates to the aggravating circumstance of the commission of the offense while knowingly creating a grave risk of death to another in addition to the victim of the offense. 42 Pa.C.S. § 9711(d)(7). This Court stated in *Commonwealth v. Wharton*, 530 Pa. 127, 152, 607 A.2d 710, 723 (1992), that a "jury is quite capable of understanding the meaning of 'grave risk of death' and of applying its common sense and experience to the facts to determine whether a grave risk had indeed been created." Thus, no definition of "grave risk of death" was required, and this claim is baseless.

■ Appellant next asserts that the trial court erred in failing to charge the jury on the mitigating circumstance of extreme mental or emotional disturbance, that appellant's drug use near the time of the murder could be a mitigating factor, and that any prior relationship between the victim and appellant was a relevant factor for consideration. Appellant's first argument is without merit as appellant not only refused to be examined by a defense psychiatrist who could have then offered evidence of any extreme mental or emotional disturbance, but the record is devoid of any evidence that appellant was suffering from such a disturbance. Mere inappropriate courtroom antics do not equal extreme mental or emotional disturbance worthy of a mitigating circumstances instruction without competent medical evidence to support such a claim that extreme mental or emotional disturbances exist.

■ Similarly, there is no record evidence that drug use was a factor in this murder. Members of appellant's family testified that he had a drug problem, but no witness testified that appellant was using drugs at the time of the murder. Hence, this claim is without foundation.

■ Further, appellant gives no explanation for his contention that his prior relationship with the victim somehow required a mitigating circumstance instruction. As the evi-

least one proper aggravating circumstance and no mitigating circumstances).

dence would not support a finding of a mitigating circumstance based upon any of these claims, the trial court committed no error in not so charging the jury.

Next, appellant claims that the trial court erred in disallowing evidence that the victim was unconscious at the time she was drowned thereby potentially negating the aspect of torture. The record reflects, however, that the trial court made no evidentiary ruling prohibiting evidence regarding the victim's state of consciousness. In fact, the medical examiner testified that he could not say for certain whether the victim was conscious when appellant put her in the bathtub.[16] Thus, this claim of error has no support in the record.

■ Lastly, appellant contends that the trial court erred by overruling defense objections to the prosecutor's penalty argument. In the portion of the prosecution's closing to which appellant objects, the prosecutor stated:

> When I sit down, [defense counsel] will speak and he'll say some of the things that I have said, life without parole and sympathy and a bad life and drug abuse and all those kinds of things. Weigh them, and I submit to you that they will be naught when you consider the circumstances under which Mr. Lester took a human life. And if you can think of a penalty that is more appropriate than the one which he deserves and which I ask of you, then impose that, but there is none. As [defense counsel] speaks, try for a moment, hold your breath for a moment and look at him and look past him to the eyes of the murderer. Hold you breath for two minutes and look past [defense counsel] . . . into the eyes of the murderer. And when you can't hold your breath any longer, take a breath and breathe and live and do what is right and give to Mr. Lester that which he deserves, which justice cries out for and which Nateefah Manigault showed you the courage to impose, the penalty of death.

N.T. 11/13/91 at 100–01.

■ In the penalty phase of a capital case, the prosecutor is entitled to use "oratorical license and impassioned argu-

16. N.T. 11/13/91 at 9–13.

ment" in favor of a sentence of death. *See Commonwealth v. Travaglia*, 541 Pa. 108, 134, 661 A.2d 352, 365 (1995). The prosecutor's comments here amounted to nothing more than a permissible exercise of oratorical flair urging the imposition of the death penalty. No relief is warranted.

## IV. *INEFFECTIVENESS OF COUNSEL CLAIMS*

██ Appellant raises twelve claims of ineffectiveness of trial counsel involving both the guilt and penalty phases. It is well established that in order for appellant to prevail on his claims of ineffectiveness of counsel, he must show that: "(1) the underlying claim is of arguable merit; (2) the particular course of conduct did not have some reasonable basis designed to effectuate his interests; and (3) counsel's ineffectiveness prejudiced him." *Commonwealth v. Howard*, 538 Pa. 86, 93, 645 A.2d 1300, 1304 (1994). *See also, Commonwealth v. Brown*, 544 Pa. 406, 424, 676 A.2d 1178, 1186 (1996); *Commonwealth v. Thompson*, 543 Pa. 634, 638, 674 A.2d 217, 219 (1996); *Commonwealth v. Wilson*, 543 Pa. 429, 440, 672 A.2d 293, 298 (1996). "A finding of ineffectiveness can never be made unless it can be concluded that the alternative not chosen offered a potential for success greater than the tactics actually utilized." *Commonwealth v. Brown*, 544 Pa. at 424, 676 A.2d at 1186.

### A. *Guilt Phase*

██ Appellant first claims that trial counsel was ineffective for failing to request a cautionary instruction regarding appellant's courtroom behavior including that he was forcibly removed from the courtroom, sequestered for most of the trial, dressed in prison clothes and handcuffed, and that he made improper comments to the jury.[17] At the time that

17. Appellant's claim misstates some of the facts of record. First, he was not removed from the courtroom in the presence of the jury; rather the second jury panel was escorted from the courtroom prior to appellant's removal. N.T. 10/31/91 at 6–7. The first panel was dismissed the previous day after appellant punched defense counsel. Second, appellant wore prison issue clothing and was handcuffed at his own election during his brief appearance before the second jury panel

appellant appeared before the jury panel in prison-issue clothing and handcuffs, the trial court cautioned the potential jurors that appellant had elected to appear dressed in the clothing and handcuffed.[18] Prior to being sworn to serve on the jury, each of the potential jurors on the panel was questioned as to whether appellant's appearance, behavior or absence from the courtroom would impair his ability to reach a fair verdict. All four of the jurors from that panel who were ultimately selected to serve on the jury [19] responded that their ability to serve would not be affected and that these facts would not prejudice appellant. Because the jurors who actually served on appellant's jury unequivocally stated that they would not be affected by appellant's behavior, appearance or absence from the courtroom during the trial, appellant cannot show that he suffered prejudice as a result of the lack of a cautionary instruction. Absent prejudice, appellant cannot prove his ineffectiveness claim.

 Appellant's second claim of ineffectiveness arises out of trial counsel's failure to object to the prosecutor's characterization of appellant's legal name as an alias.[20] Trial counsel testified at the hearing on post-verdict motions that he did not know that appellant had changed his name to the name which the prosecution considered to be an alias. Counsel's failure to object to the characterization of the name as an alias was clearly reasonable given that counsel had no knowledge of appellant's name change. Hence, this claim fails.

prior to voir dire and then removed from the courtroom after he had a brief outburst in the presence of the panel in which he stated that he and his counsel had a conflict of interest.

18. N.T. 10/31/91 at 6.

19. The remaining eight jurors selected were from a third panel and did not witness appellant's behavior or appearance.

20. Appellant claims that in 1983 he legally changed his name to Imanuel Ali. He argues that his birth certificate and related documents which are attached as the reproduced record to his appellate brief prove that he had legally changed his name. However, he did not produce these documents or any other authenticating documents at the time of trial as none are contained in the trial court record.

 Appellant next claims that his trial counsel was ineffective for failing to object to Commonwealth testimony that, at the time of his arrest, appellant was carrying a welfare card, an entry pass to a homeless shelter and a document indicating that he was unemployed, all bearing different names, claiming that the prejudice of this evidence far outweighed any probative value. The investigating homicide detective testified regarding his extensive efforts to locate appellant between the time of the murder and his arrest nearly two weeks later. He testified that at the time of his apprehension, appellant had a welfare card and an entry pass to a shelter in the name of Ronald Richardson, a receipt from a boarding home, a social security card and an employment application in the name of Emanuel Ali, and applications for social security and a voter registration card in the name of Joseph Williams. This evidence was relevant and properly admitted to show the efforts made by appellant to conceal his identity and elude police. Counsel cannot be found ineffective for failing to object to admissible and relevant evidence.

 Next, appellant contends that his trial counsel was ineffective for failing to argue to the jury or request a jury instruction on the defense of diminished capacity. This claim is disingenuous because appellant refused to cooperate with his counsel or the psychiatrist hired by his counsel to examine him. "An accused cannot refuse to cooperate with counsel in preparation of a particular trial strategy and then argue counsel's ineffectiveness for failing to pursue that course of action." *Commonwealth v. Pierce*, 537 Pa. 514, 526–27, 645 A.2d 189, 196 (1994). Therefore, this claim is baseless.

 Finally, appellant argues that his counsel rendered ineffective assistance by conceding his guilt to the jury in two separate instances.[21] In both allegations, appellant takes his

21. The first instance was during three days of voir dire when counsel either misspoke or a transcription error occurred. Counsel was describing the possible verdicts and death-qualifying the juror and stated: "But if in the [un]likely event the jury does come back with a first degree conviction, then we'll go to the penalty aspect of the case." N.T.

counsel's comments out of context. Because neither can be construed as concessions of guilt, this claim fails.

## B. *Penalty Phase*

First, appellant contends that his trial counsel was ineffective for failing to object to comments by the prosecutor indicating that appellant had shown no remorse for the murder. The prosecutor asked the jury in his closing whether they heard "one ounce of remorse" from appellant by way of mitigation. Later, he characterized appellant as a "murderer," "torturer" and "beater of children" who is "remorseless, concernless." Appellant argues that these remarks constituted improper comment on his failure to testify and infringed upon his rights under the Fifth Amendment.

*In Commonwealth v. Holland*, 518 Pa. 405, 543 A.2d 1068 (1988), this Court stated:

It is established, however, that the demeanor of a defendant, including his apparent remorse, is a proper factor to be considered by a jury in the sentencing phase of a capital case. *Commonwealth v. Travaglia*, 502 Pa. 474, 499, 467 A.2d 288, 301 (1983), cert. denied, 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984). Recognizing that the sentencing phase of trial has a different purpose than the guilt determination phase, and that the privilege against self-incrimination and the presumption of innocence have no direct application to the latter phase, this Court has held that comment upon a defendant's failure to show remorse is permitted at least where the comment does not amount to

10/31/91 at 37. Clearly, the use of the word "but" indicates that the word "likely" is mistaken.

The second occurred in counsel's closing argument where he was describing the possible verdicts to the jury and stated: "Now, there are two possible verdicts in this case: first degree murder and third degree murder." N.T. 11/12/91 at 18. Counsel then went on to detail for the jury where the jury might find reasonable doubt and reminded the jury that they could not convict if the Commonwealth had not proven its case beyond a reasonable doubt. N.T. 11/12/91 at 19–20. Hence, counsel's initial statement that there were two possible verdicts—that of first and third degree murder—was clearly placed in context and explained by counsel's later comments.

an extended tirade focusing undue attention on the factor of remorse. *Id.*, 502 Pa. at 499–500, 467 A.2d at 300–301. Here the prosecutor's comments related to remorse were limited to those quoted above which clearly do not rise to the level of a tirade. His comments referring to appellant as a murderer, torturer and child beater were within the realm of permissible oratorical flair. Thus, no relief is warranted on this issue.

▪ Appellant next claims that his counsel rendered ineffective assistance by failing to object to remarks made by the prosecutor that life imprisonment was not an appropriate penalty in this case. Specifically, the prosecutor stated:

Think about this: The penalty that you should, I submit, by the evidence and the law impose is an irrevocable one and an appropriate one. The penalty [defense counsel] will put forth is life without parole. There are some penalties that are appropriate and some that aren't, and life imprisonment with or without parole is not the appropriate penalty, because the only penalty that adequately addresses the horror of the acts Mr. Lester committed is one that says he should forfeit his life, because this life in prison without parole, well, that doesn't say much for society's concern for those who would have the misfortune of being incarcerated near Mr. Lester or those who have the misfortune of having to guard Mr. Lester. And it really doesn't say much about society's concern for the lives of the innocent or lives stripped from them by the acts of Mr. Lester. So, consider what your verdict says and consider what the evidence says.

N.T. 11/13/91 at 97.

A prosecutor is permitted to use "oratorical license and impassioned argument" in favor of a sentence of death. *See Commonwealth v. Travaglia*, 541 Pa. 108, 134, 661 A.2d 352, 365 (1995). That is precisely what the prosecutor did here. Because the prosecutor's comments were permissible argument, counsel cannot be found ineffective for failing to object.

▪ Appellant next contends that his counsel was ineffective because he informed the jury that appellant had physical-

ly attacked him. During the direct examination of the defense psychiatrist, trial counsel was attempting to establish that appellant was mentally disturbed by outlining the manner in which appellant refused to cooperate in his own defense, including physically attacking his counsel, in sum, arguing that only a mentally disturbed person would act as appellant did. Later, during his closing, counsel was once again attempting to demonstrate to the jury all of the signs that appellant was disturbed and mentioned the attack. Under the circumstances, this was a reasonable defense strategy designed to advance the theory that appellant suffered from extreme mental or emotional disturbance which appellant now claims counsel was ineffective for failing to raise. Thus, this issue lacks merit.

Next, appellant claims that trial counsel's closing argument, as a whole, demonstrates that he rendered ineffective assistance because he did not address aggravating or mitigating circumstances, referred to appellant as "not playing with a full deck" and attempted to distance himself from appellant. Here, counsel's argument, although brief, effectively pleaded for appellant's life, particularly in light of appellant's courtroom disruptions and his refusal to cooperate with counsel in formulating a defense which gave his counsel very little basis from which to extract an argument. For example, appellant refused to participate in his defense and refused to cooperate with the defense psychiatrist. Given the lack of admissible evidence presented to support a defense of mental disturbance due to appellant's obstreperousness, counsel adequately conveyed to the jury, to the limited extent possible, that appellant was mentally ill and that a mentally ill person should not be put to death. Appellant cannot demonstrate that his counsel was ineffective where the deficits in counsel's closing argument were caused by appellant's own failure to cooperate.

Appellant next claims that counsel was ineffective because he did not object to a question posed by the prosecutor to appellant's sister in which the prosecutor asked if any of

her family members use the name Africa. Appellant argues that this was an impermissible attempt to link him with MOVE, a controversial cult associated with two major violent confrontations with Philadelphia authorities. Counsel's failure to object was reasonably calculated so as not to highlight the question and give the jury reason to believe that appellant had something to hide in that regard, particularly in light of the fact that appellant's sister responded that none of her family members use the name Africa. Because counsel had a reasonable basis for not objecting and given that the witness responded that no such relationship existed, he cannot be found ineffective.

 Appellant next argues that his counsel was ineffective for calling appellant's son as a witness without adequately preparing him to testify, resulting in his son presenting damaging testimony before the jury. Appellant's son testified that he believed his father was innocent, that he was not given a fair trial, and that the jury "condemned an innocent man." [22] Appellant argues that this testimony was not in any way mitigating and only served to insult the intelligence of the jury. At the hearing on post-verdict motions, however, counsel testified that he called appellant's son in an effort to avoid a death sentence and that he reviewed with appellant's son prior to the testimony all of the questions he was planning to ask. It was a reasonable trial strategy to call appellant's son to attempt to depict appellant as a family man, innocent of the charges. Counsel's testimony indicates that he adequately prepared the witness to testify. Therefore, this issue has no merit.

 Lastly, appellant claims that his counsel was ineffective because he failed to impeach the medical examiner with evidence that the medical examiner was not licensed to practice medicine in Pennsylvania at the time he testified. Apparently, at the time of appellant's trial, the medical examiner had inadvertently failed to renew his medical license in Pennsylvania. Counsel testified on post-verdict motions that he was

22. N.T. 11/13/91 at 76–77.

unaware of the medical examiner's error with regard to the renewal of the license,[23] and, indeed, the fact that he had failed to renew his license was not made public until one and a half years after appellant's trial. Counsel cannot be ineffective for failing to raise an issue of which he was unaware. In any event, the mere failure of the witness to renew of his medical examiner's medical license would not under these circumstances affect the medical examiner's qualifications to testify as a forensic expert.[24] Hence, this issue is meritless.

## V. *CONSTITUTIONAL CHALLENGE TO THE DEATH PENALTY*

Appellant challenges the constitutionality of the Pennsylvania death penalty statute, 42 Pa.C.S. § 9711, as applied in Philadelphia County claiming that the Philadelphia District Attorney's Office fails to exercise appropriate discretion in determining those cases in which the death penalty is sought. Thus, appellant argues, the application of the statute in Philadelphia County violates the constitutional requirement that a death penalty statute must narrow the class of individuals eligible for the death penalty. Appellant cites no evidence or case law in support of this contention; rather he requests that this Court remand the matter for an evidentiary hearing in which he might garner statistical data to support his claim. Appellant has completely failed to support this argument with anything other than speculation; therefore, it merits no further review.

Because we have concluded that appellant's claims for relief are without merit, we must affirm the judgment of sentence unless we determine that (1) the sentence of death was the product of passion, prejudice or any other arbitrary factor; (2) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or (3)

**23.** N.T. 2/21/95 at 114.

**24.** The medical examiner had been board certified since 1986, had conducted in excess of 3,000 autopsies and had testified as an expert several hundred times. N.T. 11/7/91 at 81–83. Therefore, there was substantial evidence of record supporting the qualification of this witness as a forensic expert.

the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the appellant. 42 Pa.C.S. § 9711(h)(3). Having reviewed the record, we find that the sentence was not the product of passion, prejudice or any other arbitrary factor; rather, it was based upon properly admitted evidence. In addition, the evidence was sufficient, as discussed above, to support the jury's finding of the aggravating circumstance of torture.

■■■ Finally, with respect to whether the sentence of death was excessive or disproportionate to penalties imposed in similar cases, given that the sentence of death is required by law to be imposed in cases subject to 42 Pa.C.S. § 9711(c)(1)(iv) where there is at least one aggravating circumstance and no mitigating circumstances, we cannot say it was excessive or disproportionate to other cases with at least one aggravating circumstance and no mitigating circumstances subject to the same mandatory penalty.

Because we find all of appellant's arguments to be without merit, we affirm the sentence of death.[25]

Justice NIGRO files a concurring opinion in which Justices ZAPPALA and CAPPY join.

NIGRO, Justice, concurring.

I join the opinion of the majority with the exception of its analysis on Appellant's claim that the trial court erred in instructing the jury on the aggravating circumstance of torture. As recognized by the majority, the trial court did not instruct the jury that the aggravating circumstance of torture requires an intent to cause pain or suffering to the victim in addition to the intent to kill the victim. This Court has required such an instruction. *See Commonwealth v. Edmiston*, 535 Pa. 210, 236, 634 A.2d 1078, 1091 (1993); *Common-*

---

**25.** The Prothonotary is hereby directed to transmit to the Governor's Office the full and complete record of the trial, sentencing hearing, imposition of sentence and review by the Supreme Court of Pennsylvania pursuant to 42 Pa.C.S. § 9711(i).

*wealth v. Crawley,* 514 Pa. 539, 564, 526 A.2d 334, 347 (1987); *Commonwealth v. Nelson,* 514 Pa. 262, 280, 523 A.2d 728, 737 (1987). The majority finds the trial court's instruction in this case similar to the instruction approved of in *Commonwealth v. Pursell,* 508 Pa. 212, 495 A.2d 183 (1985). However, in *Pursell,* unlike in this case, the court instructed the jury that torture requires "an intention to inflict pain, suffering or both pain and suffering." 508 Pa. at 239 n. 13, 495 A.2d at 197 n. 13. Although the trial court's instruction was erroneous under the above-stated authorities, a new penalty hearing is unnecessary since the jury found one other aggravating circumstance and no mitigating circumstances. In this situation, the sentence of death is required. 42 Pa.C.S. § 9711(c)(1)(iv). Thus, I concur in the result reached by the majority on this issue.

Justices ZAPPALA and CAPPY join in the concurring opinion.